**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JESSICA WHEELER O/B/O A.T.W.,**

                      **Plaintiff,**

                v.                              **5:06-CV-1318**
                                                  **(FJS)**

**MICHAEL J. ASTRUE,**[1]
**Commissioner of Social Security,**

                      **Defendant.**
_____

**APPEARANCES**                             **OF COUNSEL**

**OLINSKY & SHURTLIFF**           **JAYA A. SHURTLIFF, ESQ.**
300 South State Street
5th Floor
Syracuse, New York 13202
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**   **JOHN M. KELLY, ESQ.**
**OFFICE OF REGIONAL**
**GENERAL COUNSEL - REGION II**
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**SCULLIN, Senior Judge**

---

    [1] On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in this action.

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff brought this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for Supplemental Security Income ("SSI") benefits for her child.

Currently before the Court are Plaintiff's and Defendant's cross-motions for judgment on the pleadings. *See* Dkt. Nos. 11, 12.

### II. BACKGROUND

Plaintiff protectively filed an application for SSI on behalf of her child, then six, on April 15, 2004.[2] *See* Administrative Record ("AR") at 53. In the disability report, Plaintiff cited hearing damage, learning disability, speech difficulty, and a disability to her child's legs that caused the child's knees to bow in. *See id*. at 68-9. The Social Security Administration denied Plaintiff's application on November 19, 2004. *See id*. at 31. Plaintiff filed a timely request for a hearing on January 20, 2005, which was held before ALJ Alfred R. Tyminski, in Syracuse, New York, on July 11, 2005. *See id*. at 35, 324. Attorney Jaya Shurtliff represented Plaintiff, who appeared and testified on behalf of her child. *See id*. at 324, 328.

---

[2] The protective filing worksheet in the record indicates that Plaintiff filed protectively on April 15, 2004, and the ALJ, in his decision, indicated this as the filing date. *See* AR at 53. The Court notes that Plaintiff signed her application for SSI benefits on behalf of her son on June 24, 2004. *See id*. at 57.

-2-

ALJ Tyminski reviewed the case *de novo* and issued a written decision denying Plaintiff's application on December 6, 2005. *See* AR at 24-29. In the decision, ALJ Tyminski stated that he carefully considered the evidence in the record and made the following findings:

> 1) Plaintiff's child has not engaged in substantial gainful activity.
>
> 2) Plaintiff's child's eustachian tube dysfunction, mild conductive hearing loss, and speech/language delays constitute severe impairments.
>
> 3) Plaintiff's child does not suffer from a medically determinable impairment or combination of impairments that meets or medically equals a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").
>
> 4) Plaintiff's child has less than marked limitations in the domain of acquiring and using information.
>
> 5) Plaintiff's child has less than marked limitations in the domain of attending to and completing tasks.
>
> 6) Plaintiff's child has no limitations in the domain of interacting with and relating to others.
>
> 7) Plaintiff's child has no limitations in the domain of moving and manipulating objects.
>
> 8) Plaintiff's child has no limitations in the domain of self-care.
>
> 9) Plaintiff's child has less than marked limitations in the domain of health and physical well-being.
>
> 10) Plaintiff's child does not have a medically determinable impairment or combination of impairments that is functionally equivalent to an impairment in the Listings.
>
> 11) Plaintiff's child is not disabled under the Act.

*See* AR at 28.

The ALJ's decision became the Commissioner's final decision on September 25, 2006, when

the Appeals Council of the Social Security Administration denied Plaintiff's request for review. *See* AR at 5-7.

Plaintiff commenced this action on October 30, 2006, *see* Dkt. No. 1, and filed a supporting brief on April 23, 2007, *see* Dkt. No. 11. Defendant filed a response brief on June 7, 2007. *See* Dkt. No. 12.

**B.    Plaintiff's child's medical history**

Plaintiff's child ("the Child") has undergone extensive testing and treatment since 2001. *See* Dkt. No. 11 at 5-19, *see generally* AR. The Child's test performance resulted in the Lafayette Central School District placing him in an inclusion class in 2001 and in the school's provision of a special education itinerant teacher, a speech and language teacher, and a teacher's aide. *See* AR at 102. By 2001, when the Child was approximately four years old, he had a sixteen-month developmental delay in fine motor skills, a thirteen-month delay in auditory comprehension, and a fifteen-month delay in expressive communication. *See id*. at 95, 112. Consequently, the Child received occupational therapy during the 2001-02 school year. *See id*. at 113. A physical therapy evaluation in 2002 revealed that, despite the occupational therapy he received in preschool, the Child had a twenty-two month delay in grasping skills and a thirteen-month delay in visual motor skills. *See id*. at 133.

For the 2002-2003 school year, Chittenango Central Schools placed the Child in a 12:1:1 classroom with pull-out services for occupational, physical, and speech therapy. *See id*. at 149. Report cards from that year indicated that the Child needed "a lot of individual help and much reinforcement." *See id*. at 167.

Intelligence testing of the Child in March of 2004 revealed that he had a verbal IQ of seventy-three, a performance IQ of ninety-four, and a full scale IQ of eighty-one.[3] *See id*. at 226, 228. Further tests showed that the Child's visual-motor skills were age-appropriate. *See id*. at 231.

On September 20, 2004, Dr. Myra Shayevitz, a consultative physician, examined the Child. *See* AR at 299-302. Dr. Shayevitz found that the Child related to others in an age-appropriate manner and had an age-appropriate attention span and gait, although he occasionally walked with his right heel off the floor. *See id*. at 300. The Child's right knee pointed slightly outward, but there was no marked deformity. *See id*. at 301. Dr. Shayevitz diagnosed the Child with a mild valgus deformity of the right knee and opined that he might benefit from "special intervention in school so that he might reach his full academic, social, and recreational potential." *See id*. at 302.

The Child repeated kindergarten during the 2004-2005 school year at Central Square Schools. *See* AR at 205. He continued to receive direct instruction in language arts, occupational therapy, and speech/language therapy. *See id*. at 204. The Child's Individualized Education Program ("IEP") report stated that he experienced "significant" language delays. *See id*. at 205. The IEP attributed the Child's language delays, attention problems, and physical concerns to his ear troubles. *See id*. Progress reports for the 2004-2005 school year stated that the Child was "developing slowly" in most skills. *See id*. at 209-10. No skills were rated as "consistently demonstrated," although the Child's social skills were described as "generally appropriate." *See id*. at 210, 206.

On November 10, 2004, two state agency medical consultants provided assessments of the

---

[3] The Child's evaluators determined that his performance IQ was most indicative of his full cognitive potential. *See* AR at 228.

Child's condition. *See* AR at 306-09. They concluded that, although the Child suffered from impairments, these impairments did not meet or medically equal the severity of any of the impairments found in the Listings.[4] *See id*. at 306.

Central Square Schools prepared a progress report regarding the Child on February 4, 2005. *See* AR at 233. The report indicated that the Child demonstrated some progress or was "progressing satisfactorily" in most areas. *See id*. at 234-40. Central Square Schools recommended that the Child continue with special education services during the 2005-2006 school year. *See* AR at 220.

Central Square Schools prepared an IEP for the 2005-06 school year. *See* AR at 218-24. That report indicated that, although math was a relative strength for the Child, he was in the first percentile for Freedom from Distractability and beneath the tenth percentile for aural and visual written skills, aural and visual input skills, aural and visual expression skills, intrasensory integration and intersensory integration. *See* AR at 220, 226. The report further stated that the Child was able to participate in the general education and physical education programs, with additional services in the summer, *see id*. at 218-19, and that the Child experienced "significant language delays in all pre-readiness skills which impact academic performance," *see id*. at 220. The report contained a general conclusion that the Child "made great gains" during the 2004-05 school year. *See id*. at 220. The IEP also stated that the Child's progress had been slow and attributed this to his ear problems. *See id*. The report went on to say that the Child "d[id] not try to read, [and]

---

[4] The state agency medical consultants concluded that the Child had a less than marked limitation in the domains of acquiring and using information, attending to and completing tasks, interacting with and relating to others, and self-care. *See id*. at 308-09. They also found that the Child had no limitation in the domains of moving about and manipulating objects and health and physical well-being. *See id*. at 309.

-6-

d[id] not appear to have any concept of what words [were]." *See id*. The IEP also stated that the Child's gait was slightly irregular and that he sometimes walked on his toes. *See id*. at 221. Finally, the report stated that his hearing problems continued to have a negative effect on his educational progress. *See id*.

On September 28, 2005, the Child's classroom teachers, special education teacher, speech therapist, and the school psychologist completed a teacher questionnaire regarding the Child's condition. *See* AR at 249-56. This questionnaire evaluated the Child's performance in the same six domains that the regulations consider. *See id*.

In the domain of acquiring and using information, the team of evaluators noted a "very serious problem" with expressing ideas in written form and a "serious problem" understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, learning new material, and applying problem-solving skills. *See* AR at 250. The team described an "obvious problem" with the Child's ability to comprehend and complete math problems and stated that the Child's "difficulty [with] reading [and] writing negatively impact[ed] upon all other aspects of his school functioning." *See id*. at 250.

In the domain of attending and completing tasks, the team identified a "very serious problem" on an hourly basis with refocusing on a task, completing work accurately, and working without distracting self or others. *See* AR at 251. The Child had a "serious problem" on an hourly basis completing class assignments and working at a reasonable pace. *See id*. The Child had an "obvious problem" paying attention when spoken to directly.[5] *See id*.

---

[5] The team arrived at similarly negative conclusions regarding the domains of interacting with and relating to others, moving about and manipulating objects, and self-care. However, the
(continued...)

### III. DISCUSSION

**A. Standard of Review**

*1. Substantial evidence*

Absent legal error, a court will uphold the Commissioner's final determination if there is substantial evidence to support it. *See* 42 U.S.C. § 405(g). The Supreme Court has defined substantial evidence to mean "more than a mere scintilla" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).

However, where the court has

> "a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."

*Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (quotation omitted).

Remand is appropriate "'"[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard[.]"'" *Rosa v. Callahan,* 168 F.3d 72, 82-83 (2d Cir. 1999) (quotation and other citation omitted). Remand is also warranted where the ALJ's findings are so vague that they prevent the intelligible review of the record. *See Martinez ex rel. Ramirez v. Astrue*, No. 07 Civ. 8848, 2008 WL 4833016, *4 (S.D.N.Y. Nov. 5, 2008) (quotations omitted); *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996) (quotation and other citation omitted); *Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841, 2008 WL 2262618, *8 (S.D.N.Y. May 30, 2008) (holding

---

[5](...continued)
ALJ's findings regarding those domains are not at issue here.

that remand was warranted because the ALJ failed to present any reasoning to justify his finding that witnesses' testimony regarding a child's impairments were not credible).

### *2. Three-step determination of disability*

To be eligible for SSI, a child under the age of eighteen must show that he suffers from a disability within the meaning of the Act. The Act defines "disability" as a medically determinable physical or mental impairment or combination of impairments that results in marked and severe functional limitations and can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i). To determine if a child claimant has sustained a disability within the meaning of the Act, the ALJ follows a three-step process:

> 1) The ALJ first determines if and when the child last engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b).
>
> 2) If, as in most cases, the child has not engaged in substantial gainful activity, the ALJ determines whether the child has an impairment or combination of impairments that is severe within the meaning of the regulations. *See* 20 C.F.R. § 416.924(c).
>
> 3) If the child has a severe impairment or combination of impairments, the ALJ must determine whether the child's impairment(s) meets or functionally equals the severity of any disorder in the Listings. *See* 20 C.F.R. § 416.924(d). To determine if an impairment or combination of impairments functionally equals a listed impairment, the ALJ must find that the impairment(s) results in "marked" limitation in two domains of functioning or "extreme" limitation in one. *See* 20 C.F.R. § 416.926a(a). The six domains to consider are the child's ability to (1) acquire and use information; (2) attend to and complete tasks; (3) interact with and relate to others; (4) move about and manipulate objects; (5) care for oneself; and the child's (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b).

A child experiences a "marked" limitation where the impairment(s) interferes with his ability to initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation occurs where the child's impairment(s) interferes very seriously with his ability to initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

To evaluate the severity of the impairment in these six domains, the ALJ measures the child's independent ability to function against that of non-impaired children of the same age. *See* 20 C.F.R. § 416.926a(b).

**B.   Whether substantial evidence supports the ALJ's finding that the Child's attention and motor function delays are not severe impairments**

The ALJ determines whether a child claimant has a severe impairment at step two of the previously described three-step disability determination process. A child claimant experiences a severe impairment where he has a medically determinable impairment that is more than a slight abnormality or combination of slight abnormalities that causes more than minimal functional limitations. *See* 20 C.F.R. § 416.924(c); *Vasquez v. Astrue*, No. 06 Civ. 7890, 2009 WL 7039913, *3 (S.D.N.Y. June 19, 2009).

When deciding whether a child claimant is disabled, the ALJ must give specific reasons for his ultimate decision. *See* 5 U.S.C. § 557(c). Courts have consistently held that "[a]mong the ALJ's legal obligations is the duty to adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so [the ALJ] must address all pertinent evidence." *Calzada v. Ast[ru]e*, --- F. Supp. 2d ----, No. 09 Civ. 3926, 2010 WL 4683570, *15 (S.D.N.Y. Nov. 17, 2010) (citations omitted); *see also Schaal,* 134 F.3d at 505; *Ferraris v. Heckler*, 728 F.2d 582, 586-87 (2d Cir. 1984).

Moreover, the ALJ has an obligation "to consider relevant and probative evidence which is available to him." *Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150-51 (2d Cir. 1984) (citation omitted). In addition, "[c]ourts in this Circuit have long held that an ALJ's '"failure to acknowledge relevant evidence or to explain its implicit rejection is plain error."'" *Calzada*, 2010 WL 4683570, at *15 (quoting *Kuleszo v. Barnhart,* 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting *Pagan on behalf of Pagan v. Chater*, 923 F. Supp 547, 556 (S.D.N.Y. 1991))).

In the instant matter, the ALJ erred where he did not offer a conclusion or reasoning regarding whether the Child's attention and motor function delays were severe impairments. The ALJ discusses the Child's attention span and motor skills only in terms of step three, where he rates the Child's abilities in the domains of attending to and completing tasks and moving about and manipulating objects. *See* AR at 27. However, the ALJ skipped a discussion of step two for these alleged limitations.[6] In the absence of such reasoning from the ALJ on the issue, the Court remands this case for further consideration.

---

[6] Defendant attempts to cover for the ALJ's lack of reasoning with a number of contentions. First, Defendant cites the opinions of the state agency medical examiners who found that the Child had no limitation in moving about and manipulating objects or in health and physical well-being. *See* Dkt. No. 12 at 14. However, a state agency physician is not an acceptable medical source under the regulations. *See* 20 C.F.R. § 416.913. Defendant's argument that Plaintiff's failure to allege that her Child had a specific impairment within the listings fails because, at step two, the Listings are not yet at issue. *See* Dkt. No. 12 at 12; 20 C.F.R. § 416.924(c). The ALJ only evaluates maladies in light of the Listings at step three. *See* 20 C.F.R. § 416.924(d). Finally, Defendant's argument that much of Plaintiff's evidence is from a period of time before Plaintiff filed for benefits on behalf of her Child fails due to the ALJ's duty to consider all the relevant evidence available. *See* Dkt. No. 12 at 14; *Lopez.*, 728 F.2d at 150-51; *Calzada*, 2010 WL 4683570, at *15. Ultimately, however, even if any of Defendant's positions was meritorious, any such reasoning should have come from the ALJ.

-11-

**C.     Whether the ALJ erred when he found that the Child's cognitive impairments were not functionally equivalent to impairments in the Listings**

Courts in this Circuit have long held that "'[i]t is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions[.]'" *Pacheco v. Barnhart*, No. 03-CV-3235, 2004 WL 1345030, *4 (E.D.N.Y. June 14, 2004) (quotation omitted).  Although the ALJ need not reconcile every ambiguity and inconsistency in the medical record, a court "cannot accept an unreasoned rejection of evidence that supports plaintiff's position." *Pagan*, 923 F. Supp. 547, 556 (S.D.N.Y. 1996) (citation omitted).  Where the ALJ fails to acknowledge relevant evidence to explain its implicit rejection, it is "plain error." *Id*. (citation omitted).

Consequently, when "'making a disability determination, the ALJ must consider all of the relevant evidence in the record'" and "'may not selectively choose evidence in the record that supports [his] conclusions.'" *Twyne ex rel. Johnson v. Barnhart*, No. 01 Civ. 2264, 2003 WL 22299198, *12 (S.D.N.Y. Oct. 7, 2003) (quotation omitted). Where the ALJ "'pick[s] and choose[s] evidence in the record that supports [his] conclusions,'" remand is appropriate. *Pacheco*, 2004 WL 1345030, at *4 (quotation omitted); *see also Dabul-Montini v. Astrue*, No. 09-CV-966, 2010 WL 3584348, *8 (N.D.N.Y. July 30, 2010) (holding that, in the case of a child claimant, "[t]he ALJ was not at liberty to simply 'pick and choose' the test scores that supported his finding, while ignoring the test scores and assessments that supported Plaintiff's position, particularly [where] some of those assessments came from [an individual] who had almost daily contact with the Claimant" (citation omitted)).

In this case, the ALJ did not mention much of the evidence that supported Plaintiff's claim, while relying on evaluations to the contrary.  In the domain of acquiring and using information, the

ALJ found that the Child's performance IQ of ninety-four, a February 2005 progress report stating that the Child was making some progress or satisfactory progress in many areas, the Child's ability to form complete sentences, and the 2005-2006 IEP stating that the Child had made "great gains" were enough to show that the Child's impairment in this domain was less than marked. *See* AR at 26. Although the ALJ acknowledged that portion of the 2005-2006 IEP which stated that the Child's reading and writing problems negatively affected all aspects of his educational functioning, the ALJ discussed no other assessments which reflected poorly on the Child's abilities in this domain. *See id*. Of particular note, the ALJ did not discuss the 2004-2005 progress reports which did not rate any of the Child's skills as "consistently demonstrated." *See id*. at 209-11. The ALJ ignored the tests from the 2005-2006 school year that assessed the Child as beneath the tenth percentile for aural and visual written skills, aural and visual input skills, aural and visual expression skills, intrasensory integration and intersensory integration. *See id*. at 226. Moreover, although the ALJ relied heavily on the vague assessment that the Child made "great gains" during the 2005-2006 school year, the ALJ ignored the statement on the very same page of that IEP report which declared that the Child did not appear to have a concept of what words were. *See* AR at 220.

Next, the ALJ did not mention indicators from that same questionnaire that the Child's problems were not restricted to reading and writing difficulties. Specifically, the ALJ did not discuss the portions of the questionnaire in which the Child's teachers, physical therapist, speech therapist, nurse, and the school psychologist, all of whom had frequent contact with the Child, opined that the Child had a "very serious problem" with expressing ideas in written form and a "serious problem" with understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, learning new material, and applying problem-solving

-13-

skills. *See* AR at 250. The questionnaire noted an "obvious problem" with the Child's ability to comprehend and complete math problems." *See id*. In light of these evaluations and the frequency with which the evaluators saw the Child, the ALJ should have incorporated the entire questionnaire into his reasoning and further explained his decision. *See Dabul-Montini*, 2010 WL 3584348, at *8.

In the domain of attending to and completing tasks, the ALJ found that the Child's ability to sustain attention during play activities and his having only slight problems with carrying out multi-step instructions and changing activities were enough to show that the Child's limitations in this domain were less than marked. *See* AR at 27. Here, again, the ALJ relied on the imprecise "great gains" statement. *See id*. The ALJ ignored the report from the 2005-2006 school year that assessed the Child in the first percentile for Freedom from Distractability. *See id*. at 226. The ALJ also did not discuss the portion of the teacher questionnaire that concluded that the Child had a "very serious problem" on an hourly basis with refocusing on a task, completing work accurately, and working without distracting self or others. *See id*. at 251. The Child had a "serious problem" on an hourly basis completing class assignments and working at a reasonable pace. *See id*. The Child had an "obvious problem" paying attention when spoken to directly. *See id*. Under *Twyne, Pacheco,* and *Dabul-Montini*, the ALJ should have evaluated the Child's good performance while at play in light of his apparent inability to concentrate when completing schoolwork.

For these reasons, the Court remands this case for further consideration as to whether the Child's cognitive impairments are functionally equivalent to impairments in the Listings. [7]

---

[7] The Court notes that the ALJ did not fulfill his duty under 20 C.F.R. § 416.924a(b)(2) to consider "other factors" in conjunction with medical evidence. *See* 20 C.F.R. § 416.924a(b)(2). In particular, the regulations dictate that, when evaluating children, the ALJ must examine the effect of a structured or highly supportive home or school setting on the child.
(continued...)

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **DENIED**; and the Court further

**ORDERS** that the Commissioner's decision is **REVERSED** and the case is **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Plaintiff and close this case.

**IT IS SO ORDERED.**
February 14, 2011

Frederick J. Scullin, Jr.
Senior United States District Court Judge

---

[7](...continued)
*See* 20 C.F.R. § 416.924a(b)(3)(iv). Here, the Child studied in a 12:1:1 classroom, which he left regularly for individual speech and physical therapy. *See* AR at 133, 140, 149, 204. *See Smith v. Massanari*, No. 00-CV-0402C, 2002 WL 34242375, *5-6 (W.D.N.Y. Mar. 17, 2002) (granting a plaintiff's motion for judgment on the pleadings on this ground where the ALJ did not consider that the child studied in a self-contained classroom with a 8:1:1 student/teacher/aide ratio). The ALJ should also address this issue on remand.